# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHRISTINE M. BAUER,**

    **Plaintiff,**

 v.                   Case No. 06-C-697

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

    **Defendant.**

# DECISION AND ORDER

Christine Bauer ("Bauer") seeks judicial review of the Commissioner's denial of her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the foregoing reasons, the Court affirms the Commissioner's decision.

## BACKGROUND

Bauer, who was 33 years old at the time of the Administrative Law Judge's ("ALJ") decision, previously worked as a medical laboratory technician. She alleges that she became disabled on February 28, 2003, due to bipolar disorder, migraine headaches, endometriosis, irritable bowel syndrome and lower back problems.

I.   Medical Evidence of Bauer's Mental Impairments

Bauer's medical records indicate that she has suffered from depression and bipolar disorder since at least July 2002. She receives treatment from Dr. Elizabeth Caspary, a psychiatrist, and Dr. Robert Chucka, a psychologist.

In April 2003, Dr. Caspary observed that Bauer was improving. She was less anxious and not as depressed. Bauer demonstrated good insight, no hallucinations or delusions, and normal judgment. However, she was "devastated" by difficulties in her relationship with her girlfriend. (R. 271-72.)

Dr. Chucka also observed Bauer in April 2003 and made similar findings. According to Dr. Chucka, Bauer had more energy, was in a brighter mood, and was trying to develop better organizational habits. Bauer also reported that she was having problems with her girlfriend. (R. 270.)

The following month, in May 2003, Dr. Caspary reported that Bauer's condition continued to improve and that she had less depression and anxiety. She appeared more alert and relaxed, and exhibited normal orientation and judgment. (R. 269.) Dr. Chucka saw her in May 2003 as well. Bauer appeared anxious to Dr. Chucka about her relationship with her girlfriend, so Dr. Chucka suggested they go to counseling together. Dr. Chucka also recommended that she tell her son about her relationship with her girlfriend. (R. 268.)

In June 2003, Dr. Caspary again reported that Bauer was improving, as she appeared less depressed and "more happy." (R. 267.) However, later that month she lost her job, and

2

her condition declined due to financial burdens and relationship problems. (R. 264, 266.) She appeared more agitated, cried, and was feeling suicidal. (R. 265.) Indeed, in July 2003, she was hospitalized for four days due to agitation and suicidal thoughts; she took too many Percocet after arguing with her girlfriend. (R. 263-64.)

On July 31, 2003, Dr. Caspary reported that Bauer was "much improved" after her hospitalization, as she was less depressed, less anxious, and had no suicidal thoughts. (R. 264.) In August 2003, Dr. Caspary noted that Bauer's sleep was "ok," she was not experiencing any manic episodes, and her condition continued to improve. (R. 261.)

In September 2003, Bauer's condition worsened. Bauer was more "edgy" and discouraged. Dr. Caspary opined that perhaps a job would help put organization and structure into her life. (R. 260.)

Bauer's condition was "much improved" in November 2003, according to Dr. Caspary. Bauer was working temporarily at a health clinic, was sleeping about six hours in the evenings, and her depression was under control. Bauer also appeared more optimistic and experienced no mania. (R. 259.) In December 2003, Dr. Caspary likewise reported that Bauer was doing well and that her condition was stable. (R. 325.)

In January 2004, Bauer had an "emergency session" with Dr. Caspary. Bauer's employer decided not to hire her full time, which caused Bauer to experience more anxiety and depression. Dr. Caspary concluded, though, that her condition remained the same as she exhibited good judgment and insight. (R. 324.)

3

Bauer's conditioned worsened the following month, in February 2004. Dr. Caspary noted that Bauer was crying a lot and exhibited poor judgment. Dr. Caspary adjusted her medication allotment. (R. 323.)

In May 2004, Bauer experienced increased depression, according to Dr. Caspary, but she exhibited good insight and was goal-oriented. Dr. Caspary prescribed Risperdal to decrease Bauer's racing thoughts and help her to relax more. By June 2004, Dr. Caspary reported that Bauer was improving and was motivated to look for a job. (R. 319-20.)

In December 2004, Dr. Caspary noted that Bauer cut down on several of her medications without doctor approval and was terminated from a job in November. Bauer denied having side effects from the medication. (R. 318.)

Also, in December 2004, Bauer visited Dr. Chucka for the first time since August 2003. Dr. Chucka reported that Bauer's condition had not changed since August 2003, but that she was experiencing mood swings and poor judgment. He also said that she was unable to hold a job. Dr. Chucka encouraged Bauer to stabilize her life by ending her relationship with her girlfriend. (R. 317.)

In February 2005, Bauer continued to improve. Dr. Caspary reported that Bauer was more "even" and was "doing fairly well." She was sleeping well and had a good appetite. She also had a better energy level. (R. 311.)

In early March 2005, Bauer visited Dr. Chucka, who reported that Bauer's condition had not changed. Bauer "felt better after clearing the air" with her girlfriend about

4

Valentine's Day. However, she was experiencing mood swings and angry outbursts as well. (R. 310.)

A week after her visit to Dr. Chucka, Bauer was hospitalized for suicidal ideation and mood swings. Bauer claimed that she thought about overdosing on her medications, but in the end decided not to because of her thirteen-year-old son. On examination, she was appropriately dressed and groomed and had normal speech, but she had a depressed mood and sad affect. (R. 348.) An increase in Effexor improved her condition, and when she was discharged a few days later, Bauer was alert, bright, social and had no suicidal thoughts. (R. 344.)

In April 2005, Bauer visited both Drs. Caspary and Chucka. Dr. Caspary reported that her condition had worsened since she last saw her, due in part to Bauer's financial and relationship problems. Dr. Caspary noted that Bauer did not experience any side effects from her medication. Dr. Chucka also reported that Bauer was experiencing more depression and anxiety due to her financial difficulties, but that she also "[s]till has ideas about going back to work." (R. 306.)

When Bauer visited Dr. Caspary in May 2005, Dr. Caspary observed that Bauer had improved again. She had no side effects from the medication and she was less depressed, more energetic, and more hopeful. She also was more active around the house. (R. 305.) Dr. Chucka, however, reported several days later that Bauer exhibited less energy and motivation. (R. 304.)

5

In June 2005, both Drs. Caspary and Chucka opined that her condition had not changed the past month. Bauer again had no side effects from her medication. However, she was more susceptible to panic and angry outbursts. In fact, Bauer had recently hit her girlfriend in anger. Dr. Caspary suggested that Bauer attend couple therapy with her girlfriend. Dr. Chucka tried to help Bauer acknowledge the dysfunctional nature of her relationship with her girlfriend. (R. 302-03.)

In July 2005, Dr. Caspary noted that Bauer had a "little depression" and some racing thoughts. Bauer's demeanor was generally alert, pleasant, and she exhibited "ok" judgment. Finally, in August 2005, Dr. Chucka reported no change in Bauer's condition. He said that Bauer "[a]ctually [is] doing pretty well lately," and that she has not been around her girlfriend as much. Bauer told Dr. Chucka that she wants to develop healthier habits, but has lacked the discipline thus far to do so. She left with the goal to cook more often. (R. 300-01.)

II.  Physicians' Medical Analysis of Bauer's Mental Conditions

In May 2003, Dr. Caspary completed a medical examination and capacity form. She conveyed that Bauer would have difficulties engaging in complex tasks, decision making, working around other people, and being in unfamiliar environments. In fact, Dr. Caspary opined that Bauer was unable to participate in any work activities.

In July 2003 and January 2004, state agency psychologists reviewed Bauer's medical evidence and concluded that Bauer did not meet the criteria for any of the mental health

6

listings. (R. 132-47.) One of the physicians opined that while Bauer was moderately limited in her ability to sustain concentration in some instances, she was not significantly limited in her ability to carry out very short and simple instructions, perform activities with a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, and work in coordination with or proximity with others without being distracted by them. (R. 132.)

In January 2005, Dr. Caspary completed a mental impairment questionnaire in which he opined that Bauer had "manic syndrome," recurrent panic attacks, sleep disturbances, and persistent anxiety. Dr. Caspary believed that Bauer would have to be absent from work over twice a month as a result. (R. 60-62.)

Dr. Caspary completed a medical examination and capacity form in September 2005. She opined that Bauer had a low tolerance for frustration and sometimes had difficulty engaging in complex tasks that require judgment. She also noted that Bauer had difficulty with decision making, panic attacks, and impulse control. Dr. Caspary indicated that Bauer's ability to live a healthier lifestyle would be improved by a job search and job skills training. (R. 64-65.)

Also, in September 2005, Dr. Chucka completed a "Mental Residual Functional Capacity Questionnaire." In it, he described Bauer's symptoms as "unstable mood, poor concentration, poor judgment, disrupted sleep, and difficulty following through on behavior changes." He also reported that she suffered from decreased energy, suicidal thoughts,

7

impaired impulse control, unstable interpersonal relationships, memory impairment, and deeply ingrained maladaptive patterns of behavior. (R. 66-67.)

III. <u>Medical Evidence of Bauer's Physical Impairments</u>

In March 2003, Bauer went to the hospital due to back pain and was described as having drug-seeking behavior. (R. 195) The following month, Bauer underwent a consultative examination by neurosurgeon Dr. P. Daniel Suberviola for back problems. Dr. Suberviola noted no weakness, drift, or atrophy. Bauer could walk on her heels and toes without difficulty. A computerized tomography (CT) scan and a magnetic resonance imaging (MRI) revealed very mild disk bulging but no evidence of foraminal or central spinal stenosis. Dr. Suberviola's impression was that she suffered from mild degenerative lumbar disk disease. (R. 123-24.)

In July 2003, a state agency physician reviewed the medical evidence and concluded that Bauer could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently, sit for up to six hours in an eight-hour workday, stand for up to six hours in an eight-hour workday, and stoop occasionally. (R. 125.)

IV. <u>ALJ Hearing and Decision</u>

On October 13, 2005, ALJ Gary J. Suttles held a video teleconference hearing. Bauer and a vocational expert testified at the hearing. The ALJ applied the familiar five-step sequential evaluation and found that physically, Bauer could lift and carry 20 pounds occasionally, 10 pounds frequently, and sit, stand, or walk six hours in an eight-hour

8

workday. He also found that she had an unlimited ability to push and pull with normal gross and fine dexterity.

However, the ALJ found that Bauer had mental limitations. According to the ALJ, Bauer should only have limited employee and public contact. The ALJ also found that Bauer could perform and concentrate on simple tasks, understand simple instructions, relate to others and adapt to workplace changes and supervision. (R. 22.) In sum, the ALJ concluded that Bauer retained a residual functional capacity ("RFC") to perform light work and was not disabled because she could perform a significant number of jobs in the national economy. (R. 24.) The Appeals Council denied review, which made the ALJ's determination the final decision of the Commissioner. (R. 4.)

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act limits the scope of judicial review of the Commissioner's final determination, and provides that the findings of the Commissioner as to any fact shall be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000). A court may reverse the Commissioner when the ALJ's decision is not supported by substantial evidence or is based on legal error. *Eads v. Secretary of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993).

**DISCUSSION**

Bauer alleges that the ALJ erred in the following six respects: (1) he failed to provide a logical bridge between the evidence and his conclusion; (2) he did not discuss Dr. Chucka's questionnaire; (3) he improperly evaluated her mental impairment; (4) he improperly relied upon the state agency physicians; (5) he failed to address the statements of Bauer's friend, Christine Menzel; and (6) he made an erroneous credibility determination. The Court will address each alleged error in turn.

I.   The Adequacy of the ALJ's Discussion

Bauer alleges that the ALJ wrote an inadequate opinion because, when concluding that Dr. Caspary's assessments ought to be given little weight, the ALJ failed to discuss some of the medical evidence that emphasized Bauer's more disabling symptoms. However, an ALJ need not provide a written evaluation of every piece of evidence. *See Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). He is required only to "build an accurate and logical bridge from the evidence to [his] conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

Here, the ALJ adequately explained why he did not give controlling weight to Dr. Caspary's assessments. Citing both the medical reports of January 2005 and February 2005 (Exhibits 7B, pages 15 and 17), the ALJ pointed out that Dr. Caspary opined that Bauer "sometimes had difficulty controlling anger, impulses and being in unfamiliar environments." (R. 19-20.) Nevertheless, the ALJ explained that Dr. Caspary's opinions were not entirely

10

supported by or consistent with the evidence in the record as a whole. (R. 20.) Despite having setbacks, the ALJ accurately referred to Dr. Caspary's reports showing that Bauer was doing well most of the time with appropriate adjustments in her medications. His decision to not give Dr. Caspary's medical source opinion controlling weight, therefore, was supported by an adequate explanation and substantial evidence in the record.

II.     Consideration of Dr. Chucka's Questionnaire

Bauer also alleges that the ALJ's failure to mention Dr. Chucka's September 2005 questionnaire is reversible error. SSR 96-8p requires the ALJ to always consider and address a medical source opinion, and if it conflicts with the ALJ's conclusions, then the ALJ must explain why it was not adopted. A medical source opinion is an opinion as to what an individual can still do despite her impairments. *See Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006).

Dr. Chucka's questionnaire is not a medical source opinion. It merely chronicles Bauer's impairments, not what she could still do despite her impairments. For instance, Dr. Chucka reported that Bauer's symptoms include "unstable mood, poor concentration, poor judgment, disrupted sleep, [and] difficulty following through on behavior change." (R. 66.) The list of symptoms begs the question, though, as to what *capabilities*, if any, Bauer retains. For instance, does Bauer's symptom of "poor concentration" mean that she cannot even concentrate on simple tasks? Dr. Chucka does not say.

11

The ALJ acknowledged that Bauer suffers from mental impairments, finding that Bauer can only perform and concentrate on simple tasks, understand only simple instructions, and must have limited employee and public contact. Dr. Chucka's questionnaire does not say anything about whether Bauer has these capabilities or not. Accordingly, the evidentiary usefulness of the questionnaire is slight, and it certainly is not a medical source opinion the ALJ was required to discuss.

III.  Evaluation of Bauer's Mental Impairments

Bauer next argues that the ALJ failed to apply the special technique applicable to the review of mental impairments. The Commissioner must determine whether a claimant has an impairment that meets or is equal in severity to the criteria of numerous impairments, known as the "listings," that the Commissioner has determined are presumptively disabling. *See* 20 C.F.R. § 416.920a. A mental impairment generally will meet a listing if the impairment produces a "marked" or greater degree of limitation in two or more of the following four broad categories: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *See* 20 C.F.R. § 416.920a(c)(3). An ALJ's obligation to follow the special technique may be satisfied by his adoption of a consultant who applied the technique. *See Beth v. Astrue*, 2007 WL 1880301, at *25 (E.D. Wis. June 26, 2007); *David v. Barnhart*, 446 F.Supp.2d 860, 877 (N.D. Ill. 2006).

The ALJ in the instant action adopted the evaluation of the state agency reviewing physician who applied the special technique. According to the state agency physicians,

12

Bauer's mental condition imposed mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. The ALJ concurred with the state agency physician's assessment, and because Bauer did not suffer a "marked" limitation in two of the four broad categories, the ALJ properly found that she was not presumptively disabled.

IV.     The ALJ's Reliance on the State Agency Physicians

In July 2003 and January 2004, state agency physicians reviewed Bauer's medical evidence and concluded that Bauer did not meet the criteria for any of the mental health listings. (R. 132-47.) One of the physicians opined that while Bauer was moderately limited in her ability to sustain concentration in some instances, she was not significantly limited in her ability to carry out very short and simple instructions, perform activities with a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, and work in coordination with or proximity with others without being distracted by them. (R. 132.) The ALJ concurred with the opinions of the state agency physicians. (R. 18-20.)

Bauer contends that the ALJ improperly relied upon the opinions of the state agency physicians. The ALJ committed no such error. In his written opinion, the ALJ acknowledged that generally a non-examining physician's opinion is afforded less weight than a treating physician, but the ALJ properly explained why he was giving the state agency physicians' opinions more weight in this case. (R. 19.) The opinions of the state agency physicians were consistent "with the record as whole." *See* SSR 96-6p. For instance, as the

13

ALJ pointed out, the opinions of the state agency physicians were consistent with Dr. Caspary's observations that Bauer, while experiencing occasional setbacks, was doing well most of the time assisted by appropriate adjustments in her medications. The ALJ's reliance on the opinions of the state agency physicians, therefore, was reasonable and supported by substantial evidence.[1]

V.     The Statements of Christine Menzel

A friend of Bauer, Christine Menzel, submitted a written form that essentially corroborated Bauer's assessment of her daily activities and symptoms. The ALJ did not discuss Menzel's testimony, which Bauer alleges is reversible error. Bauer is wrong. As mentioned above, the ALJ does not need to discuss every piece of evidence in the record. *See Schmidt*, 395 F.3d at 744. He needs only to "sufficiently articulate his assessment of the evidence" so as to enable the Court to trace the path of the ALJ's reasoning. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam). Failure to discuss a particular lay person's testimony is not necessarily fatal to an ALJ's decision. *See id.* Rather, the test is whether the ALJ adequately addressed the line of evidence to which the lay person's testimony was directed. *See id.*

Menzel's testimony essentially corroborated many of the symptoms Dr. Caspary noted, and which the ALJ addressed. The ALJ discussed Dr. Caspary's opinion that Bauer

---

[1] Bauer also complains that one of the state agency physician's signature was illegible, which prevented Bauer from deciphering who completed the report. Bauer's complaint is without merit. Underneath the signature, the physician's name is stamped in printed form. His name is Dr. Keith Bauer, PhD. (R. 134.)

14

suffered marked limitations in her daily activity, social functioning, and in maintaining concentration, (R. 18.), which Menzel also maintained. (R. 104-112.) The ALJ also addressed Dr. Caspary's observations that Bauer had a low tolerance for frustration and sometimes had angry outbursts, (R. 19-20.), which Menzel also claimed to observe. (R. 104-112.) Menzel's testimony presented a line of evidence that the ALJ discussed, so the ALJ did not error by failing to discuss Menzel's testimony explicitly. *See Carlson*, 999 F.3d at 181.

VI.  The ALJ's Credibility Assessment

Finally, Bauer alleges that the ALJ improperly discredited her subjective complaints about the severity of her back pain, migraine headaches, and side effects from medication. The Court usually does not disturb the credibility finding of an ALJ, so long as there is support in the record for the finding and it is not patently wrong. *See Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

In the instant action, the ALJ discredited Bauer's complaints for good reason. For instance, in an emergency room visit in March 2003 due to back pain, Bauer reported that she was being treated by a pain clinic physician named Dr. Baman and she had badly bulging discs. However, when the emergency room physician called Dr. Baman, he said that Bauer only suffered from mild disc disease. Furthermore, Dr. Baman said that he referred Bauer to a pain psychologist because he thought she was using medication inappropriately. The emergency room physician concluded, based on the information he received from Dr. Baman

15

and his examination of Bauer, that Bauer was not in severe pain and rather exhibited drug seeking behavior.

In July 2003, Dr. Baman reported that Bauer's migraine headaches were controlled by Maxalt. He also reported that her back pain was "stable." Indeed, the record overall indicates that her back pain and migraine headaches were controlled with proper medication.

Bauer also alleged that she often felt sedated as a side effect of her medications. While it is true that Bauer at times reported that she felt tired and lacked energy, the ALJ also cited several instances where she denied experiencing any side effects from her medications. In December 2004, February 2005, March 2005, April 2005, May 2005, and June 2005 Bauer told Dr. Caspary that she did not have any side effects from the medications. (R. 302, 305, 307, 309, 314, 318.) Accordingly, there is support in the record that shows that the ALJ's determination was not "patently wrong."

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Commissioner's Decision is **AFFIRMED**.

The clerk is directed to enter judgment and close this case accordingly.

Dated at Milwaukee, Wisconsin this 9th day of August, 2007.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**